UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
GREG BURLEY,                      )
                                  )
              Plaintiff,          )
                                  )
        v.                        )  Civil Action No. 11-1222 (EGS)
                                  )
NATIONAL PASSENGER RAIL           )
CORPORATION,                      )
                                  )
              Defendant.          )
_____)

## MEMORANDUM OPINION

Plaintiff Greg Burley brings this lawsuit alleging that
defendant National Passenger Rail Corporation ("Amtrak")
discriminated against him on the basis of his race when it
investigated an accident in which he was involved, determined
that he was more culpable than a co-worker, and terminated his
employment. Mr. Burley alleges violations of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the
District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et
seq.* Pending before the Court is defendant's motion for summary
judgment. Upon consideration of the motion, the responses and
replies thereto, the applicable law, and the entire record, the
Court **GRANTS** defendant's motion.

## I.  BACKGROUND

### A.  Factual Background[1]

*1.  Mr. Burley's Work as an Amtrak Engineer.*

In 2005, Greg Burley was accepted into Amtrak's engineer training program and ultimately became a fully certified engineer. Defendant's Statement of Material Facts ("Def.'s SMF") ¶ 1. Mr. Burley was assigned to work in Ivy City, where Amtrak's maintenance facilities for the Washington, D.C. terminal are located. *Id.* ¶¶ 1-2. His job was to work with a conductor and an assistant conductor to move train cars around Ivy City. *Id.* ¶ 3.

Mr. Burley's role was governed by rules promulgated by the Northeast Operating Rules Advisory Committee ("NORAC Rules"). *Id.* ¶ 7. As the engineer of the group, he conducted all physical operation of the train engine, *id.* ¶¶ 4-5, and Rule 956 made him "responsible for the observance of all signals and for controlling movements accordingly." NORAC Rules, Ex. F to Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 30-8 at 9. Pursuant to Rule 951, meanwhile, the conductor remained "in charge . . . as to the general management of the train," *id.*, and was

---

[1] Portions of plaintiff's statement of material facts lack any citation to the record. When possible, the Court has relied on the record to support these allegations, but it cannot accept allegations that remain unsupported. *See SEC v. Banner Fund Int'l,* 211 F.3d 602, 616 (D.C. Cir. 2000) ("the district court is under no obligation to sift through the record and should instead deem as admitted the moving party's facts that are uncontroverted by the nonmoving party's [statement of material facts].") (quotation marks and alterations omitted).

responsible for directing Mr. Burley's actions. *See* Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶¶ 4, 70-71.

Pursuant to Rule 16, engineers must not allow their train to pass a Blue Signal—a sign designed to notify engineers that track workers may be present. *See* Def.'s SMF ¶ 10; NORAC Rules, Ex. F. to Def.'s Mot., ECF No. 30-8 at 3-5. A Blue Signal takes the form of a blue flag or sign and may also display a blue light, but engineers must stop for a Blue Signal even if it is not accompanied by a blue light. *Id.* ¶ 11.[2] In Ivy City, Blue Signals are often paired with permanently installed derailers, devices that force an engine off of the track when they are applied. *Id.* ¶¶ 14, 16. Derailers are used in situations where failing to stop the engine may threaten the safety of track workers. *Id.* ¶ 15. Rule 104(d) requires engineers to know the locations of these permanent derailers, and bans engineers from operating over an applied derailer. *Id.* ¶ 17.

While in Ivy City, engineers are also required to operate at "restricted speed," which Rule 80 defines as a speed that permits "stopping within one half the range of vision short of . . . [d]erails set in the derailing position." NORAC Rules, Ex. F to Def.'s Mot., ECF No. 30-8 at 6; *see also* Def.'s SMF ¶ 18. Relatedly, an engineer who is unsure whether the track ahead

---

[2] Plaintiff asserts that a Blue Signal "must" include a blue light but provides no support for his claim. *See* Pl.'s SMF ¶ 11.

contains a Blue Signal or derailer must stop the engine and check before proceeding. *Id.* ¶ 19.

Finally, under Rule 116, when an engineer is not located on the "leading end" of the engine's movement, "a crew member must be stationed on the leading end of the movement to observe conditions ahead" and "[i]f signals from the crew member cannot be received by the Engineer, the movement must be stopped immediately." NORAC Rules, Ex. 12 to Pl.'s Opp. to Mot. for Summ. J ("Pl.'s Opp."), ECF No. 40-4 at 2.

2. *The Accident and the Investigation.*

On October 20, 2007, Mr. Burley was working with Conductor Jerry Ebersole and Assistant Conductor Lawrence Mahalak. Def.'s SMF ¶ 20. The crew was directed to pick up a train car that had been undergoing maintenance on Track 7 in the Service and Inspection Building. *Id.* ¶ 22. As their engine approached Track 7, Mr. Ebersole instructed Mr. Mahalak to exit the engine and begin to prepare the train car they were picking up. *Id.* ¶ 23.

Mr. Burley then received radio notification that the derailers on Track 7 were "down" and that he could proceed. Pl.'s SMF ¶ 76. As the engine proceeded, Mr. Ebersole exited to the side opposite Mr. Burley, without alerting him. Def.'s SMF ¶ 24; Pl.'s SMF ¶ 81. Believing that Mr. Ebersole was on the front of the engine, Mr. Burley proceeded along Track 7. Pl.'s SMF ¶¶ 80-81. He noticed that the blue lights on the exterior of the

Service and Inspection Building, which should be illuminated when a Blue Signal is displayed on a particular track, were not on and he saw neither a Blue Signal nor an applied derailer on the track. *Id.* ¶¶ 78-79. Mr. Burley's engine nonetheless ran over an applied derailer and derailed. Def.'s SMF ¶ 25.

Soon after the accident, Leslie David Smith, the Assistant Superintendent for Terminal Services, arrived at the scene to investigate the accident. *Id.* ¶ 26.[3] Mr. Smith, who is Caucasian, assembled an Incident Committee, which also included Bernard Campbell and William Lighty, who are African-American. *Id.* ¶¶ 27-28; Pl.'s SMF ¶ 28. Although there were multiple committee members, Mr. Smith took the lead in investigating the accident and writing the Committee's Report. *See* Pl.'s SMF ¶¶ 27, 91.

Mr. Smith inspected the accident site soon after the derailment occurred and noticed that the derailer was applied, and that a Blue Signal and blue light were located underneath the derailed engine. *See* Def.'s SMF ¶¶ 29-30. Mr. Smith concluded from this that the Blue Signal was displayed on the track at the time of the derailment and that the engine had passed through the Blue Signal and over the derailer. *Id.* ¶ 31. Mr. Burley does not dispute Mr. Smith's characterization of what

---

[3] When Mr. Smith arrived at the scene, Mr. Ebersole told him "well, he was up on the engine by himself. It's his fault." Burley Dep., Ex. 14 to Pl.'s Opp., ECF No. 37-1 at 236:19-20. Mr. Smith appears not to have responded. *See id.* at 237:4-7.

he found after the accident, but notes that Mr. Smith did not personally witness the display beforehand. *See* Pl.'s SMF ¶¶ 29-30, 84.

Mr. Smith also interviewed each of the crew members. Pl.'s SMF ¶ 83. During his interview of Mr. Ebersole, Mr. Smith learned that Mr. Ebersole had exited the engine prior to the derailment. *See* Ebersole Interview Tr., Ex. 21 to Pl.'s Opp., ECF No. 40-6 at 5:3-16, 7:15-22.

To memorialize his findings, Mr. Smith composed an Incident Report, which catalogued Mr. Mahalak's departure "with the approval of Ebersole and the knowledge of Burley." Incident Report, Ex. 2 to Sherlock Decl., ECF No. 30-7 at 17. The Report found that Mr. Ebersole "by his estimation approximately 150 feet north of the point of derailment, dismounted to the east side while the locomotive was moving at slow speed" and that Mr. Ebersole "did not advise Burley of the position of the derail." *Id.* It also stated that Mr. Ebersole's intent was "to walk ahead of the locomotive to the [Service and Inspection Building]." *Id.* The Report noted that Mr. Burley continued down Track 7 and "took no action to stop the locomotive or otherwise positively determine the position of the derail." *Id.* at 18.

The Report concluded that the cause of the accident was that "[t]he Engineer failed to stop for an applied blue-flag derail" and Mr. Ebersole and Mr. Mahalak "were not in position to assist

the Engineer." *Id.* at 16, 18. The Report also stated that the incident was being treated "as decertifiable based on anticipated damage and the Restricted Speed and Blue Flag violations." *Id.* at 18.

Based on these findings, Amtrak brought formal charges against Mr. Burley and Mr. Ebersole. Mr. Burley was charged with violating NORAC Rules 16 (passing a Blue Signal), 80 (exceeding restricted speed), 104 (passing an applied derailer), and 956 (general duties of an engineer). *See* Burley Charges, Ex. 3 to Sherlock Decl., ECF No. 30-7 at 22-23. Mr. Ebersole was also charged with violating Rules 16 and 104, as well as Rule 941, which holds conductors responsible for the conduct of everyone on the train, and an internal Amtrak rule that bars employees from exiting a moving engine. *See* Ebersole Charges, Ex. 1 to Pl.'s Opp., ECF No. 42-1 at 1-2.

>    3.   *Amtrak Waives Mr. Ebersole's Charges But Not Mr. Burley's.*

Mr. Burley and Mr. Ebersole were permitted to request that Amtrak waive the charges against them in exchange for admitting to the conduct and accepting punishment. Def.'s SMF ¶¶ 39-40, 46. Amtrak may accept or reject a waiver request at its discretion, Def.'s SMF ¶ 41, and it is forbidden from keeping any "formal transcript, statement, or recording" of waiver proceedings involving engineers. *See* Collective Bargaining

Agreement, Ex. 1 to Sherlock Decl., ECF No. 30-7 at 10.[4]

Ultimately, Amtrak denied Mr. Burley's request for a waiver,

Def.'s SMF ¶ 42, but granted Mr. Ebersole's request and

suspended him for fifteen days. *Id.* ¶ 46; Pl.'s SMF ¶ 104.

There is only limited evidence regarding the process by which

Mr. Burley's request was denied. The record supports a finding

that one or more of Daryl Pesce, General Superintendent of the

Mid-Atlantic Division; Michael Sherlock, Acting General

Superintendent of the Mid-Atlantic Division; and Mr. Smith may

have been involved in the decision to deny it. *See* Def.'s SMF ¶¶

43-44 & n.8; Pl.'s SMF ¶ 43A. Amtrak officials, however, do not

have a specific memory of the request. Def.'s SMF ¶ 44; Pl.'s

SMF ¶ 106. While not direct evidence of why the request was

denied, Mr. Pesce testified that he would not have granted the

request because of the seriousness of the charges and because

plaintiff's denial that a Blue Signal was properly displayed

made an investigation necessary. Def.'s SMF ¶ 45; *see also*

Sherlock Decl., Ex. E to Def.'s Mot., ECF No. 30-7 ¶ 15.

There is less information regarding Mr. Ebersole's request.

Neither Mr. Sherlock nor Mr. Pesce were involved in granting it.

---

[4] Mr. Burley asserts that there may be informal records, Pl.'s
SMF ¶ 41, but neither supports nor explains this contention and
there is no indication that such documents exist. He also
requests a spoliation inference on this issue "[a]s set forth in
Plaintiff's Opposition," *id.* ¶ 41 n.2, but that brief mentions
spoliation only in connection with an unrelated issue. *See* Pl.'s
Opp. at 40.

Pl.'s SMF ¶ 46. Plaintiff claims that Mr. Smith was involved, *id.* ¶¶ 46, 107, but the evidence he cites is the deposition testimony of an individual who repeatedly stated that he did not know whether Mr. Smith was involved. *See* Pingley Dep., Ex. 20 to Pl.'s Opp., ECF No. 39-5 at 11:18-20, 18:18-21. The only evidence bearing on why Mr. Ebersole's request may have been granted are statements by Mr. Pesce and Mr. Sherlock that Mr. Ebersole's offense was less serious because he was not on the engine when the derailment occurred. Def.'s SMF ¶ 46.

   *4.  The Disciplinary Process.*

   Once Mr. Burley's waiver request was denied, Amtrak held a formal disciplinary hearing. *See* Def.'s SMF ¶ 48. Mr. Burley's union representative appeared at this hearing, questioned Amtrak's witnesses, and presented evidence and argument. *Id.* ¶ 49. During the hearing, Mr. Smith testified that he found a Blue Signal and blue light on the tracks underneath the derailed engine and that Mr. Ebersole exited the engine prior to the derailment. *See id.* Mr. Burley testified that Amtrak lacked proof that a Blue Signal was properly displayed or that a blue light was illuminated at the time of the accident. *Id.* ¶ 50. The Hearing Officer, relying heavily on Mr. Smith's testimony, found that "the evidence in this case clearly shows that the banner was erected (found under the locomotive) and the Blinking Blue Light Warning Protection/Stop Signal (found under Eng. 558 at

the derail location) was displayed as required by the rule." Ex.
K to Def.'s Mot. for Summ. J., ECF No. 30-13 at 4. The Hearing
Officer concluded that "the charges have been proven." *Id.*

Mr. Pesce was then tasked with imposing discipline. Def.'s SMF
¶ 53. He reviewed the decision of the Hearing Officer, the
hearing transcript, and the Incident Committee's Report. *Id.* ¶
55 & n.10. These materials led Mr. Pesce to "believe[] Burley
was solely at fault for the derailment." Pl.'s SMF ¶ 55A
(quotation marks omitted). Accordingly, he determined that Mr.
Burley should be terminated because of the seriousness of
disregarding a Blue Signal and derailing an engine. *Id.* ¶ 56.[5]
Mr. Pesce also determined that Amtrak was required by law to
suspend Mr. Burley's engineer certificate for 30 days. *Id.* ¶¶
57-59.

Mr. Burley filed a series of appeals of his punishment. First,
he appealed to Amtrak's Director of Labor Relations, L.C.
Hriczak, who affirmed the punishment. *See* Def.'s SMF ¶ 60. Next,
Mr. Burley appealed his termination to the Special Board of
Adjustment 928, a federal arbitration body that hears disputes

---

[5] After the fact, other Amtrak officials testified that they
might have imposed a lesser punishment due to mitigating
factors. *See* Pl.'s SMF ¶ 54 (Mr. Smith recommended "a penalty of
only thirty days suspension"); *id.* ¶ 123 (Mr. Pingley and Mr.
Lighty testified that termination may have been excessive);
Sherlock Dep., Ex. D to Def.'s Mot., ECF No. 30-6 at 23:11-21
(Mr. Sherlock testified that Mr. Ebersole's exit without
informing Mr. Burley "might be mitigating circumstances").

involving train engineers. *Id.* ¶ 61; *see* 45 U.S.C. § 153. The
Special Board of Adjustment found "substantial evidence in the
record of [Mr. Burley's] violations," noted that "termination in
the instant matter was excessive" although the offense was
nonetheless a serious one, and ordered that Mr. Burley be
reinstated without back pay. *See* Ex. N to Def.'s Mot., ECF No.
30-15 at 2-3. Finally, Mr. Burley appealed the suspension of his
certification to the Department of Transportation's Locomotive
Engineer Review Board, Def.'s SMF ¶ 64, which found that a Blue
Signal and blinking blue light had been discovered under the
train after the accident, but determined that there was not
"substantial evidence" to support a finding "that the blue
signal was properly displayed." Ex. O to Def.'s Mot., ECF No.
30-17 at 5. Accordingly, it overturned the suspension of Mr.
Burley's certification. *See id.* at 6.

**B. Procedural History**

After Mr. Burley was reinstated and his engineer certification
was restored, he filed an internal complaint with Amtrak's
Dispute Resolution Office, alleging that he was discriminated
against due to his race. Def.'s SMF ¶ 66. After investigation,
the Dispute Resolution Office found no merit to this claim. *Id.*
Mr. Burley then filed a race-discrimination complaint with the
Equal Employment Opportunity Commission, which issued a Notice
of Right to Sue on April 17, 2011. *Id.* ¶ 67.

On June 30, 2011, Mr. Burley filed this lawsuit. He alleges
that Amtrak's decisions to deny his request for a waiver,
terminate him, and revoke his engineer certification were
racially discriminatory in violation of Title VII and the D.C.
Human Rights Act. *See* Compl., ECF No. 1 ¶¶ 13-18. On April 8,
2013, defendant filed a motion for summary judgment. That motion
is ripe for determination by the Court.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the moving party has
shown that there are no genuine issues of material fact and that
the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C.
Cir. 2002). A material fact is one that is capable of affecting
the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986). A genuine issue exists where the
"evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Id.* A court considering a motion for
summary judgment must draw all "justifiable inferences" from the
evidence in favor of the nonmovant. *Id.* at 255.

To survive a motion for summary judgment, however, the
requester "must do more than simply show that there is some
metaphysical doubt as to the material facts"; instead, the
nonmoving party must come forward with "'specific facts showing

that there is a genuine issue for trial.'" *Matsushita Elec.*
*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)
(quoting Fed. R. Civ. P. 56(e)). Moreover, "although summary
judgment must be approached with special caution in
discrimination cases, a plaintiff is not relieved of his
obligation to support his allegations by affidavits or other
competent evidence showing that there is a genuine issue for
trial." *Adair v. Solis*, 742 F. Supp. 2d 40, 50 (D.D.C. 2010)
(quotation marks and alterations omitted).

## III. DISCUSSION

   Title VII makes it unlawful for an employer to "fail or refuse
to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin." 42 U.S.C. § 2000e-2(a)(1). To establish
unlawful discrimination, Mr. Burley must show that: "(1) []he is
a member of a protected class; (2) []he suffered an adverse
employment action; and (3) the unfavorable action gives rise to
an inference of discrimination." *Wiley v. Glassman*, 511 F.3d
151, 155 (D.C. Cir. 2007).[6]

_____

[6] Plaintiff's claim under the D.C. Human Rights Act requires
similar proof, so the Court addresses it jointly with his Title
VII claim. *See Ajisefinni v. KPMG LLP*, __ F. Supp. 2d __, 2014
WL 658405, at *7 (D.D.C. Feb. 12, 2014) ("The legal standard for

It is undisputed that Mr. Burley is an African-American, which is a protected class, and that he suffered an adverse employment action when he was terminated. The parties dispute whether the record supports an inference that Amtrak's actions were motivated by discrimination.

Mr. Burley presents no direct evidence of discrimination, so his claims are subject to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The D.C. Circuit has indicated, however, that as soon as the defendant articulates a legitimate, non-discriminatory reason for the adverse employment action, "the district court need not -- *and should not* -- decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). Once a legitimate, non-discriminatory reason is proffered, the Court must determine whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the [plaintiff]." *Id.*

---

establishing a discrimination . . . claim under the [D.C.] Human Rights Act is substantially similar to the standard under Title VII.") (alterations in original) (citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999)).

Amtrak claims that it denied Mr. Burley's request for a waiver
and terminated his employment because its investigation found
that he was culpable for a Blue Signal violation, and that it
revoked Mr. Burley's certification because it believed that it
was required to do so by law. Mr. Burley attacks these
explanations as pretext and argues that Amtrak: (1) was wrong
about the facts of the accident, which he claims provides a
reason for a jury to infer that Amtrak is covering for
discrimination; (2) conducted an investigation so flawed that it
supports an inference that discrimination permeated the
investigation; and (3) has favored Caucasian employees involved
in similar situations.

## A.   No Reasonable Jury Could Infer that Amtrak is Lying About its Reasons for Disciplining Mr. Burley.

Mr. Burley's first argument in support of pretext is that a
jury could find that Amtrak's beliefs regarding the facts of the
accident and the appropriate punishment were erroneous. Although
"a factfinder's disbelief of the reasons put forward by the
defendant may support an inference of intentional
discrimination," *Barnett v. PA Consulting Grp.*, 715 F.3d 354,
360 (D.C. Cir. 2013) (quotation marks omitted), the question is
not whether a jury could disagree with Amtrak's decisions. An
inference of discrimination may arise only if "the employer is
making up or lying about the underlying facts that formed the

predicate for the employment decision." *Brady*, 520 F.3d at 495;
*see also Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180,
1183 (D.C. Cir. 1996) (inference arises if the employer "made an
error too obvious to be unintentional"). By contrast, "[i]f the
employer's stated belief . . . is reasonable in light of the
evidence . . . there ordinarily is no basis for permitting a
jury to conclude that the employer is lying . . . ." *Brady*, 520
F.3d at 495.

Amtrak claims that it sincerely believed that Mr. Burley's
conduct warranted denial of his request for a waiver and
termination of his employment because the Incident Committee
concluded that a Blue Signal was properly displayed prior to the
accident and Mr. Burley contested this finding. *See* Def.'s Mot.
at 6-8. Mr. Burley provides no direct evidence that Amtrak or
its officials did not hold those beliefs, so a jury could infer
discrimination only if those beliefs were unreasonable.

Mr. Burley begins by challenging the reasonableness of
Amtrak's belief that a Blue Signal was properly displayed before
the accident. He does not argue that Amtrak's conclusion was
baseless; rather, he asserts that "[t]here are disputes of
material fact as to whether the blue flag derail was applied at
the time of the derailment." Pl.'s Opp. to Mot. for Summ. J.
("Pl.'s Opp."), ECF No. 44 at 5 (quotation marks omitted).
Indeed, Mr. Smith found a Blue Signal and a blue light

underneath the derailed engine soon after the accident. *See* Def.'s SMF ¶¶ 29-30. Although Mr. Smith did not personally see the Blue Signal prior to the accident, Pl.'s SMF ¶¶ 29-30, 84, it was reasonable to infer that the Blue Signal ended up underneath the derailed engine because it was displayed over the track prior to the accident.

The fact that Amtrak's conclusion was not the *only* possible conclusion does not cast doubt on the sincerity of its belief. Disciplinary investigations must resolve disputes of fact and permitting a jury to infer pretext from its disagreement with an investigation's findings "would mean that every employee who is disciplined . . . could sue for employment discrimination . . . and—merely by denying the underlying allegation of misconduct—*automatically* obtain a jury trial." *Brady*, 520 F.3d at 496 (emphasis in original). This would turn the Court into "a super-personnel department that reexamines an entity's business decisions." *Barnett*, 715 F.3d at 359.[7]

For similar reasons, Mr. Burley's request for a spoliation inference in connection with a videotape of the accident would not create a genuine issue of material fact. *See* Pl.'s Opp. at

---

[7] Because this dispute regarding the facts of the accident cannot disprove the sincerity of Amtrak's belief in the conclusions of its investigation, the Court need not address defendant's claim that the arbitration ruling of the Special Board of Adjustment precludes Mr. Burley from re-litigating factual issues related to the accident. *See* Def.'s Mot. at 9; Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 43 at 3-5.

40. Although "a negative inference may be justified where the defendant has destroyed potentially relevant evidence," *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170 (D.C. Cir. 2013), the only evidence that a videotape even existed is hearsay. *See* Edler Decl., Ex. 10 to Pl.'s Opp., ECF No. 40-2 ¶ 4 (declaration of Mr. Burley's union representative that he was "told that security camera video of the incident existed" and that "Roy Runkles, the AMTRAK employee charged with monitoring the recording equipment, told me that AMTRAK had erased the tapes").[8] In any event, granting Mr. Burley's request for an inference "that the videotape supports his version of events," Pl.'s Opp. at 40, would not create an inference of pretext for the same reason that viewing the facts of the accident in the light most favorable to Mr. Burley does not support such an inference; it

---

[8] Plaintiff asserts that the statement by Roy Runkles is an admission by a party opponent under Federal Rule of Evidence 801(d)(2). *See* Pl.'s Surreply, ECF No. 52 at 22. He relies, however, on cases admitting statements that spoke directly to a supervisor's biased motivations and were made by declarants who had "some authority to speak on matters of hiring or promotion" or were "involved in the decision-making process in general." *E.g.*, *Talavera v. Shah*, 638 F.3d 303, 309-10 (D.C. Cir. 2011). By contrast, a statement is properly excluded in the absence of evidence that it was "within the scope of [the declarant's] employment or that [the declarant] was given authority to speak on behalf of [the employer] on the subject." *Id*. at 310. Mr. Runkles appears to have had no involvement with the underlying employment decisions and investigation and there is no evidence that he had any authority to speak on behalf of Amtrak.

does not undermine the sincerity of Amtrak's belief in the results of its investigation. *See supra* at 16-17.[9]

Nor is there any evidence that Amtrak did not believe that Mr. Burley's conduct warranted denial of his request for a waiver. While the record is sparse, it reflects that Amtrak considers the seriousness of an offense and whether an employee denies the results of the initial investigation in deciding whether to grant a waiver. Def.'s SMF ¶ 45; *see also* Sherlock Decl., Ex. E to Def.'s Mot., ECF No. 30-7 ¶ 15. Mr. Burley argues that his request for a waiver, by definition, is an acceptance of the investigation's findings. Pl.'s SMF ¶ 108. Even so, Mr. Burley contested the finding that a Blue Signal was displayed and such a situation may require a formal hearing to resolve the dispute. *See* Def.'s SMF ¶ 45. In any event, Mr. Burley was charged with serious safety violations and has not produced evidence "for a reasonable jury to find that [this] . . . was not the actual reason" for the denial of his request. *Brady*, 520 F.3d at 494.

---

[9] Mr. Burley appears to request an additional inference that the videotape—if it existed—was destroyed "to prevent Burley from having a fair hearing on his claims." Pl.'s Opp. at 40. There is no evidence to support such an inference. *Cf. Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 73 & n.31 (D.C. Cir. 1982) (denying request for spoliation where "the circumstances of the destruction . . . provide no basis for attributing bad faith to [the defendant]"). Plaintiff relies on *Gerlich*, 711 F.3d 161, but that case involved clear evidence that the documents at issue had been "intentionally destroyed" and, in any event, the Court was not facing a request for a spoliation inference with respect to the reasons that documents were destroyed, only the potential contents of those documents. *See id.* at 170-72.

With respect to Amtrak's termination of Mr. Burley's employment, plaintiff admitted that Mr. Pesce made this decision "believ[ing] Burley was solely at fault for the derailment," Pl.'s SMF ¶ 55A, but argues that termination was an excessive punishment. *See id.* ¶¶ 54-56, 123. In support, he cites deposition testimony from individuals who testified that termination "might" have been excessive. *See* Sherlock Dep., Ex. D to Def.'s Mot., ECF No. 30-6 at 23:11-21; Lighty Dep., Ex. D to Def.'s Reply, ECF No. 43-5 at 16:20-22, 18:1-9, 19:10-16; Pingley Dep., Ex. 20 to Pl.'s Opp., ECF No. 39-5 at 35:20-36:2. Mr. Smith also testified that he would not have recommended termination "in this scenario." Smith Dep., Ex. F to Def.'s Reply, ECF No. 43-7 at 44:19-45:8. None of this evidence, however, demonstrates that Amtrak imposed termination for discriminatory reasons. Even if termination was excessive, "Title VII protects against discriminatory decisions, not wrong ones." *Hairsine v. James*, 517 F. Supp. 2d 301, 308-09 (D.D.C. 2007). Nor does the evidence show that Mr. Pesce's decision to terminate Mr. Burley was "an error too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183. In any event, Mr. Pesce could not have acted for discriminatory reasons because he was unaware of Mr. Burley's race. *See infra* at 21 n.11.[10]

---

[10] Mr. Burley separately challenges Amtrak's suspension of his engineer certification. He believes that Amtrak should have

**B.  No Reasonable Jury Could Infer Pretext from Amtrak's Investigation.**

Mr. Burley's second argument in support of pretext is that Amtrak's investigation was so flawed that a jury could infer "that discriminatory treatment may have permeated the investigation itself." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 856 (D.C. Cir. 2006). Notably, Mr. Burley does not challenge the motivations of Mr. Pesce or Mr. Sherlock during the course of the investigation and disciplinary process.[11] Instead, plaintiff claims that Mr. Smith orchestrated the

_____

considered mitigating circumstances, such as Mr. Ebersole's behavior. *See* Pl.'s Opp. at 20. The relevant regulations mandate that an engineer's certification be suspended when the engineer "[f]ail[s] to control a locomotive or train in accordance with a signal indication . . . that requires a complete stop before passing it." 49 C.F.R. § 240.117(e)(1). Mr. Burley admitted that Amtrak found that he committed such a violation. *See* Pl.'s SMF ¶ 58. Although the regulations permit consideration of whether "an intervening cause prevented or materially impaired" an engineer from complying, 49 C.F.R. § 240.307(i)(1), the formal hearing concluded that the charges against Mr. Burley had been proven despite Mr. Ebersole's behavior. *See* Decision Letter, Ex. K to Def.'s Mot. for Summ. J., ECF No. 30-13 at 4.

[11] This is unsurprising because unrebutted evidence shows that neither knew that plaintiff was African-American until after the events of this case, Sherlock Decl., Ex. E to Def.'s Mot., ECF No. 30-7 ¶ 16; Def.'s SMF ¶ 59, and "[i]t is axiomatic that a defendant cannot be found to have discriminated against a plaintiff on the basis of race where the defendant had no knowledge of the plaintiff's race." *Pollard v. Quest Diag.*, 610 F. Supp. 2d 1, 21 (D.D.C. 2009). Plaintiff's unsupported speculation that Mr. Pesce was aware of his race because Mr. Pesce supervised a small number of engineers, Pl.'s SMF ¶ 59, is not supported by any evidence that Mr. Pesce, then General Superintendent of Amtrak's Mid-Atlantic Division, supervised a small number of employees with whom he was familiar.

investigation so that Mr. Burley would be blamed, and that he did so for discriminatory reasons.[12]

Although Mr. Burley identifies no direct evidence that Mr. Smith acted for discriminatory reasons, an inference of discrimination could still arise if his investigation was "not just flawed but inexplicably unfair." *Mastro*, 447 F.3d at 855. Mr. Burley claims that the investigation falls within this doctrine because Mr. Smith "ran the Incident Committee and manipulated the report" and intentionally hid evidence that would have inculpated Mr. Ebersole. *See* Pl.'s Opp. at 18-22. Plaintiff, however, supplied no evidence of manipulation and appeared to testify that he had no basis for believing that Mr. Smith was being untruthful. *See* Burley Dep., Ex. 18 to Pl.'s Opp., ECF No. 37-1 at 232:25-233:8, 337:13-338:7. Mr. Burley's dispute ultimately focuses on two issues: Mr. Smith's alleged failure to include certain facts in his Report and what Mr. Burley claims were procedural infirmities in the investigation. *See* Pl.'s Opp. at 19-22.

---

[12] The defendant argues that Mr. Smith's motivations are irrelevant because he did not direct any of the adverse employment actions of which Mr. Burley complains. *See* Def.'s Reply at 13-16. Plaintiff believes that Mr. Smith's investigation and testimony influenced the ultimate decisionmakers within the meaning of the Supreme Court's decision in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011). *See* Pl.'s Opp. at 14-16. The Court need not address this dispute because no reasonable jury could infer that Mr. Smith acted with discriminatory motivations.

As to Mr. Smith's Report, Mr. Burley claims that it omitted mention of "when Ebersole abandoned his position and jumped off the train," that Mr. Ebersole had violated Amtrak and NORAC Rules, and "why Ebersole was not in a position to assist Burley." *Id.* at 19-20. The first fact was actually included in the Report. *See* Incident Report, Ex. 2 to Sherlock Decl., ECF No. 30-7 at 17. Although the Report did not mention the particular rules that were violated by any crew member, it contained facts that formed the basis for charging Mr. Ebersole with four rule violations, including one for exiting a moving engine. *See* Ebersole Charges, Ex. 1 to Pl.'s Opp., ECF No. 42-1 at 1-2. The third fact—why Mr. Ebersole was not on the train—is mentioned in the Report, along with other details of Mr. Ebersole's departure from the engine—he exited the engine "to walk ahead of the locomotive to the [Service and Inspection Building]" and failed to advise Mr. Burley of the position of the derail. *See* Incident Report, Ex. 2 to Sherlock Decl., ECF No. 30-7 at 17.

Nor was Mr. Smith's investigation procedurally unfair like the investigation the D.C. Circuit addressed in *Mastro*. In that case, the investigation turned on the relative credibility of witnesses whose testimony contradicted that of the plaintiff. *See Mastro*, 447 F.3d at 848-49. The investigation nonetheless failed to consider those witnesses' credibility—even though all

23

had strong motive to lie. *Id.* at 855-56. Further, the investigator's assessment of the evidence relied on vague feelings rather than serious analysis, and the employer failed to consider the plaintiff's lack of motive to lie. *See id.* By contrast, Mr. Smith based his findings on physical evidence of what was found after the accident. *See* Def.'s SMF ¶¶ 29-31. To the extent he relied on witness statements, it was to establish the undisputed fact that Mr. Ebersole had exited the engine and failed to inform Mr. Burley about the position of the derailer. *See* Incident Report, Ex. 2 to Sherlock Decl., ECF No. 30-7 at 17-18. Moreover, Mr. Smith's investigation was reviewed by formal procedures during which Mr. Burley was able to cross-examine Mr. Smith regarding his investigation and Report, and to present his own evidence and argument. *See supra* at 9-11.

**C. No Reasonable Jury Could Infer that Amtrak Favors Similarly Situated Caucasian Employees.**

Mr. Burley's third argument is that his treatment deviated from that of similarly situated Caucasian employees. To prove this, Mr. Burley must "produc[e] evidence suggesting that the employer treated other employees of a different race . . . more favorably *in the same factual circumstances*." *Brady*, 520 F.3d at 495 (emphasis added). In this Circuit, comparators must have been "charged with offenses of comparable seriousness" and "'all of the relevant aspects of [their] employment situation[s] [must

have been] nearly identical.'" *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). Factors relevant to this inquiry include "whether the alleged comparators dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Kassim v. Inter-Continental Hotels Corp.*, __ F. Supp. 2d __, 2013 WL 6154115, at *5 (D.D.C. Nov. 25, 2013). "If no reasonable juror could conclude that two employees were similarly situated, then a court may find they were not similarly situated as a matter of law." *Evans v. Holder*, 618 F. Supp. 2d 1, 11 (D.D.C. 2009) (citing *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005)).

    *1.   Mr. Ebersole*

Plaintiff's primary argument is that Mr. Ebersole is a proper comparator because the two were involved in the same accident and Mr. Ebersole was treated more favorably. While individuals in different occupations are not always proper comparators, they may be if they "were accused of making similar mistakes, were equally responsible for avoiding those mistakes, and were disciplined by the same superior." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011). Mr. Ebersole, however, shares none of

these traits with Mr. Burley. For one, there is no evidence that Mr. Ebersole was disciplined by Mr. Smith, Mr. Pesce, or Mr. Sherlock. *See supra* at 8-9.

Moreover, although Mr. Burley believes that Mr. Ebersole was at least as culpable for the accident, material differences in their conduct and responsibilities make them improper comparators. As reflected in Amtrak's charges, Mr. Burley was present on the engine and Mr. Ebersole was not. *See* Burley Charges, Ex. 3 to Sherlock Decl., ECF No. 30-7 at 22-23; Ebersole Charges, Ex. 1 to Pl.'s Opp., ECF No. 42-1 at 1-2. The Incident Committee, as well as Mr. Sherlock and Mr. Pesce, found this to be a material difference that justified holding Mr. Burley more culpable. Incident Report, Ex. 2 to Sherlock Decl., ECF No. 30-7 at 1-3; Def.'s SMF ¶ 46. It is therefore a "differentiating . . . circumstance[] that would distinguish their conduct or the employer's treatment of them for it." *Kassim*, 2013 WL 6154115, at *5.

Mr. Ebersole and Mr. Burley also had distinct responsibilities. It was Mr. Burley's sole responsibility to operate the engine, and it was Mr. Ebersole's responsibility to oversee the train and the crew. *See* Def.'s SMF ¶¶ 4-5; Pl.'s SMF ¶¶ 4, 70-71; NORAC Rules, Ex. F to Def.'s Mot., ECF No. 30-8 at 9. Mr. Burley believes that Mr. Ebersole's responsibilities as a conductor render him more culpable for the accident, but "it is

not the role of this Court to disagree with the defendant's
conclusion about the relative seriousness of
Plaintiff's misconduct versus [a comparator's] alleged rules
infractions, because Title VII does not hold employers liable
for erroneous judgment, unless that judgment is motivated by an
illegal discriminatory motivation." *Phillips v. Holladay Prop.
Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (quotation marks
omitted).

Mr. Burley opines that he and Mr. Ebersole were equally
culpable for the accident because Mr. Ebersole exited a moving
train, failed to alert Mr. Burley to his departure, and was not
stationed on the leading end of the engine's movement. *See* Pl.'s
Opp. at 29-34. This does not make them proper comparators,
however, because it only renders their conduct more distinct.
Amtrak provided evidence that physical presence on a train is a
key factor in deciding an employee's culpability for an ensuing
accident and Mr. Burley provided no evidence to contradict this.
*See* Def.'s SMF ¶ 46. Mr. Burley would permit a jury to infer
discriminatory intent from its disagreement with Amtrak's
personnel determinations. Absent evidence that Amtrak's
culpability determination was entirely unreasonable or that it
differed from Amtrak's treatment of similarly situated
employees, it is not for the Court to second-guess Amtrak's
determination of the relative seriousness of distinct conduct

committed by employees with distinct responsibilities. *See*

*Phillips*, 937 F. Supp. at 37.

    2.   *Other Proposed Comparators.*

Plaintiff also identified six Caucasian engineers who were
involved in safety violations but were not terminated. *See* Opp.
at 35-39. He believes that the treatment of these comparators
undermines Amtrak's assertion that it harshly disciplines all
engineers for serious safety violations. *Id.* at 38. The utility
of these comparators, however, is severely limited because none
share a supervisor with Mr. Burley. "[I]n order to effectively
compare the [employer's] actions toward [the comparator and the
plaintiff], the supervisors taking those actions on behalf of
the employer must have been the same." *Kassim*, 2013 WL 6154115,
at *7. "This point follows logically from the cause of action
itself, which requires proof that the decisionmaker has acted
for a prohibited reason"; different decisionmakers "may rely on
different factors when deciding whether, and how severely, to
discipline an employee." *Coleman v. Donahoe*, 667 F.3d 835, 847,
848 (7th Cir. 2012) (quotation marks and emphasis omitted). Mr.
Burley claims that the Amtrak official who discriminated against
him was Mr. Smith, yet none of his proposed comparators were
disciplined by Mr. Smith.[13]

---

[13] Mr. Pesce or Mr. Sherlock disciplined some of plaintiff's
comparators, but plaintiff failed to rebut evidence that neither

These comparators are also distinct because none "engaged in the same conduct" as Mr. Burley and many had "differentiating or mitigating circumstances that . . . distinguish . . . the employer's treatment of them . . . ." *Kassim*, 2013 WL 6154115, at *5. Mr. Burley's conclusory assertions that a jury could find that the conduct was similar do not explain how, despite these comparators' different conduct, which violated different NORAC rules, they are "nearly identical" to him. *See Holbrook*, 196 F.3d at 261.[14]

Some of Mr. Burley's proposed comparators were involved in very distinct safety violations, such as "an incident in which the engine he was operating experienced an undesired emergency application of the brakes," Pesce Decl., Ex. L to Def.'s Mot., ECF No. 30-14 ¶ 14, or a failure "to properly line a hand-operated switch for a trailing point movement," which resulted in damage to the switch. *See id.* ¶ 15. These engineers' conduct did not involve a derailment or the failure to obey a signal and

---

were aware of his race before he was disciplined. *See supra* at 21 n.11. Thus, comparator evidence regarding these individuals cannot prove that they discriminated against Mr. Burley.

[14] Mr. Burley appears to believe that the rule violations are similar because they are all listed in federal regulations which govern when an engineer's certification must be suspended. *See* Pl.'s Opp. at 35. These regulations, however, do not govern Amtrak's decisions regarding waivers of punishment or termination. *See* 49 C.F.R. § 240.117.

thus cannot readily be compared to Mr. Burley's failure to obey a Blue Signal, which resulted in a derailment.

Others caused accidents by operating their engines above restricted speed. *See, e.g.*, Sherlock Decl., Ex. E to Def.'s Mot., ECF No. 30-7 ¶ 19; Pl.'s Opp. at 38-39. Unlike Mr. Burley, however, they were not also charged with a signal violation or with operating their engine over an applied derailer.

The remaining comparators engaged in conduct that is closer to Mr. Burley's, but Mr. Burley explained their favorable treatment as a product of their ties to Amtrak, not their race. One engineer received a waiver after running his engine over the same switches twice in one day, resulting in a derailment. *See* Burley Dep., Ex. 18 to Pl.'s Opp., ECF No. 37-1 at 371:7-19. His conduct does not appear to have involved failure to obey a signal and Mr. Burley testified that this engineer was treated favorably due to family ties to Amtrak. *See id.* at 372:2-5. Similarly, Mr. Burley identified an engineer who was given a waiver after two stop-signal violations. *See id.* at 370:9-20. This conduct did not involve a Blue Signal violation and Mr. Burley testified that this individual was treated favorably "[b]ecause of his strong connection. He was a [Washington Terminal] man too." *Id.* at 370:23-371:6.

Ultimately, no reasonable jury could rely on Mr. Burley's proposed comparators to conclude that Amtrak was motivated by

discrimination. None were disciplined by the individual Mr. Burley claims discriminated against him. None engaged in the same conduct as Mr. Burley and many engaged in very distinct conduct. Finally, Mr. Burley noted that some of his comparators were treated better due to family or personal connections, not their race.[15]

## IV.  CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** defendant's motion for summary judgment. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**     **Emmet G. Sullivan**
            **United States District Judge**
            **March 31, 2014**

---

[15] Mr. Burley identified two comparators who were charged with a derailment resulting from a Blue Signal violation, but both are African-American engineers. *See* Sherlock Decl., Ex. E to Def.'s Mot, ECF No. ¶ 20; Burley Dep., Ex. 18 to Pl.'s Opp., ECF No. 37-1 at 375:7-377:6, 377:7-23. If anything, these potential comparators undermine his argument because one was treated the same as Mr. Burley—terminated for a Blue Signal violation—after his second safety violation in one year, and the second was treated better than Mr. Burley—not terminated after a Blue Signal violation—even though she shares the characteristic he claims motivated his punishment. *See Phillips*, 937 F. Supp. 32, 36 (the fact that similarly situated comparator who shared the plaintiff's race was treated more favorably "serve[d] only to undermine Plaintiff's race-based disparate treatment claim").